UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

| | |
|---|---|
| CAM LOGISTICS, L.L.C. | CASE NO. 1:20-cv-445 |
| -vs- | JUDGE DRELL |
| PRATT INDUSTRIES, INC. *ET AL.* | MAGISTRATE JUDGE PEREZ-MONTES |

## MEMORANDUM RULING AND ORDER

Before the court is a motion for partial summary judgment, (Doc. 75), filed by Plaintiff CAM Logistics, L.L.C. ("CAM") to find Defendant Pratt (Rockwall Corrugating), L.L.C. ("Rockwall") liable for breach of contractual obligations to CAM. For the reasons outlined below, we will **DENY** the motion for partial summary judgment.

I.  BACKGROUND

While this court is located far from the bright lights of New York City's eponymous theatre cluster along Broadway, sufficient understanding of the "main characters" central to this case is helpful, perhaps not unlike what an arts patron would have in the form of a playbill:

**CAM Logistics, L.L.C.**: A limited liability company whose sole member, Susan Stedman, is domiciled in Ohio. The company specializes in supply chain services and solutions, including freight shipment and warehousing. (Doc. 1).

**Patrick Shea**: Vice President of CAM who is domiciled in the state of Ohio. (Doc. 75-3).

**Pratt Industries, Inc.**: A corrugated packaging company incorporated in Delaware and has a principal place of business in Georgia. (Doc. 1).

**Pratt (Rockwall Corrugating), L.L.C.**: A limited liability company whose sole member is Pratt Corrugated Holdings, Inc.—a subsidiary of Pratt Industries, Inc.—which is also incorporated in Delaware and has a principal place of business in Georgia. Rockwall operates a facility in Rockwall, Texas that produces recycled paper and corrugated paper packaging. (Doc. 75-1).

1

**Richard Turner**: A strategic account manager employed by a company called Pratt (Jet Corr), Inc.—a separate Delaware company with its corporate headquarters in Georgia that is affiliated with Pratt and Rockwall. (Doc. 77-1).

**John Batts**: General manager at Rockwall. (Doc. 77-2).

**England Economic and Industrial Development District**: Warehouse owner and logistics services provider based in Alexandria, Louisiana. (Doc. 75-1).

In fair Detroit, Michigan, where we lay our scene, Richard Turner ("Mr. Turner") and Patrick Shea ("Mr. Shea") met at a conference targeting minority and women business enterprises in October 2017. (Doc. 1). Mr. Shea shared with Mr. Turner that he worked with CAM—a supply chain and logistics company that provides, among other things, warehousing services. Mr. Turner informed Mr. Shea that his employer's parent company, Pratt Industries, Inc. ("Pratt"), had recently earned new business from Procter & Gamble Company ("P&G"). (Doc. 75-1). One of Pratt's affiliate entities, Rockwall, would supply corrugated packaging material to a P&G supplier in Pineville, Louisiana. Mr. Turner managed Pratt's relationship with P&G and shared with Mr. Shea his needs for a warehouse in central Louisiana to facilitate the new business award. (Doc. 75-1). Rockwall needed the warehouse space in central Louisiana to store the corrugated packaging material it manufactured in Texas for shipment to the Pineville-based P&G supplier. (Docs. 77, 77-2). Following the conference, Mr. Turner referred CAM (and other supply chain companies) to Rockwall's general manager, John Batts ("Mr. Batts"), for consideration. Mr. Batts ultimately decided to pursue discussions with CAM. (Doc. 77-1).

On October 24, 2017, Mr. Shea emailed Messrs. Turner and Batts, to determine Rockwall's warehousing needs and to furnish a quote upon receipt of a response. (Doc. 75-4). Mr. Turner, on behalf of Pratt, replied to that message with a "snapshot" outlining overviews for the corrugated packaging materials' supply chain, the warehouse needs, and basic contract provisions, including an anticipated contract term spanning from January 1, 2018 to December 31, 2020. (Doc. 75-4).

On December 1, 2017, Mr. Shea responded on behalf of CAM with monthly rates for Rockwall's warehousing needs that increased from the first year to the second year and remained stable from the second year into the third year of the contract.[1] (Doc. 75-4). Unsatisfied with the quote for warehouse services, Mr. Batts reentered price negotiations with Mr. Shea. (Doc. 75-1). On December 6, 2017, Mr. Shea agreed to reduce CAM's pricing by approximately 5%, and Mr. Batts accepted on Rockwall's behalf. (Doc. 75-3). On December 11, 2017, Mr. Shea sent a draft of CAM's warehousing and logistics service agreement to Mr. Batts for Rockwall's general counsel to review (the "December 11, 2017 Draft"). (Doc. 75-7). Shortly thereafter, Mr. Shea claims to have informed Mr. Batts of CAM's need to lease warehousing space in the Alexandria, Louisiana area to meet Rockwall's warehousing needs. (Doc. 75-3). Mr. Shea ran into a problem while negotiating the leasing agreement with the warehouse owner, England Economic and Industrial Development District ("EEIDD") and turned to Messrs. Turner and Batts for assistance. (Docs. 75-1, 75-8). Mr. Turner responded to Mr. Shea's message with talking points that could be used in its discussions with EEIDD but noted that P&G—which made the business award to Pratt—would not be able to issue a written statement due to "numerous levels of approval" needed. (Doc. 75-8). By late December 2017, Mr. Shea successfully negotiated the remaining terms of the lease with EEIDD for CAM and fully executed the agreement on January 18, 2018. (Doc. 75-9).

Months later, on April 24, 2018, Mr. Batts emailed Rockwall counsel's markup of CAM's original warehousing and logistics services agreement ("April 24, 2018 Draft") to Mr. Shea, which included, among other edits: (1) a choice of law clause naming Delaware state law as controlling for disputes arising from the contract; and (2) a forum selection clause placing any disputes

---

[1] According to the email from Mr. Shea to Messrs. Turner and Batts, the increase from the first year to the second year resulted from an expected 20,000-square-foot increase in warehouse space (*i.e.*, from 40,000 square feet to 60,000 square feet). (Doc. 75-4).

3

regarding the contract before the proper court—state or federal—in Delaware. (Doc. 75-14). On May 18, 2018, Mr. Batts followed up with Mr. Shea on the April 24, 2018 Draft stating that Rockwall "needed to get [the contract] put to bed." (Doc. 77). In the end, neither representative from CAM nor Rockwall signed the December 11, 2017 Draft or the April 24, 2018 Draft of the warehousing and logistics services agreement or any other contract. (Docs. 75-1, 77).

During the summer of 2019, Mr. Batts claims to have informed Mr. Shea of changes at P&G that would no longer require Rockwall's use of CAM's warehouse services. (Doc. 77-2). Mr. Turner alleges to have alerted Mr. Shea of the same changes in November 2019. (Doc. 77-1). In March 2020, Rockwall informed CAM that it no longer needed CAM's warehousing services and that beginning May 1, 2020, Rockwall would no longer pay the monthly service fee of $49,928.69. (Docs. 75-1, 77). Rockwall paid the monthly service fee to CAM for warehousing and logistics services from January 2018 to April 2020. (Doc. 75-13). Despite the originally contemplated increase in the monthly fee from $49,928.69 in 2018 to $55,728.66 in 2019 and 2020, Rockwall's payment to CAM never reflected such an increase. (Doc. 75-13). Additionally, the record does not reflect an increase in warehouse square footage from 40,000 in 2018 to 60,000 in 2019 and 2020, as printed in the April 24, 2018 Draft. (Doc. 75-14).

Plaintiff filed this suit with our court on April 9, 2020, citing diversity jurisdiction, because CAM's sole member, Susan Stedman, is domiciled in Ohio, while Defendants Pratt and Rockwall's sole member, Pratt Corrugated Holdings, Inc., are incorporated in Delaware and have a principal place of business in Georgia. (Doc. 1). As the litigation wore on, Defendants filed a motion to dismiss for (1) lack of subject matter jurisdiction; (2) lack of personal jurisdiction over (a) Pratt and (b) Rockwall; (3) improper venue; or, alternatively, (4) a motion to transfer venue to the District of Delaware. (Doc. 15). Defendants' motion was granted in part as to the dismissal of

Pratt for lack of personal jurisdiction, but the motion was denied in part, finding this court could exercise specific personal jurisdiction over Rockwall based upon its contacts with Louisiana. (Doc. 42). And because of those contacts, the court denied in part Defendants' motion to dismiss for improper venue, finding that the relevant contacts within the state significantly impacted the Western District of Louisiana. This court also found Defendants' claims for lack of subject matter jurisdiction unmeritorious and denied the motion to dismiss on those grounds. Finally, Defendants' motion to transfer was denied. (Docs. 42, 56).

Plaintiff filed the instant motion for partial summary judgment on July 25, 2022. (Doc. 75). Defendants filed an opposition to the motion on August 16, 2022. (Doc. 77). Plaintiff then filed a reply to the opposition on August 23, 2022. (Doc. 80).

## II.   PARTIAL SUMMARY JUDGMENT STANDARD

"A partial summary judgment order . . . is not a final judgment but is merely a pre-trial adjudication that certain issues are established for trial of the case." Streber v. Hunter, 221 F.3d 701, 737 (5th Cir. 2000) (internal citation and quotation marks omitted). Partial summary judgment, like its more fulsome counterpart, summary judgment, "serves . . . to root out, narrow, and focus the issues" argued at trial. Calpetco 1981 v. Marshall Exploration, Inc., 989 F.2d 1408, 1415 (5th Cir. 1993).

Under Rule 56 of the Federal Rules of Civil Procedure, courts must grant summary judgment where "the movant shows that there is no genuine dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (emphasis added). A material fact is one which "might affect the outcome of the suit," and a factual dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Sanchez Oil & Gas Corp. v. Crescent Drilling & Prod., Inc. 7 F.4th 301, 309 (5th Cir. 2021) (citing

Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986)). If the movant fails to meet this initial burden, then the court must deny summary judgment. Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994). That mandate persists regardless of the nonmovant's response. Id. If the movant does, however, meet this burden, the nonmovant must go beyond the pleadings and identify specific facts showing a genuine dispute that must be argued at trial. Sanchez Oil, 7 F.4th at 309 (internal citations omitted). The nonmovant will be required to submit "significant probative evidence" to support their claim. State Farm Life Ins. Co. v. Gutterman, 896 F.2d 116, 118 (5th Cir. 1990). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Liberty Lobby, 477 U.S. at 249.

When ruling on a motion for summary judgment, it is improper for a court to make a credibility determination or weigh the evidence. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). A court must also view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in that party's favor. Clift v. Clift, 210 F.3d 268, 270 (5th Cir. 2000). Under this standard, a genuine dispute of material fact exists when the evidence would allow for a reasonable trier of fact to return a verdict for the nonmovant. Renfroe v. Parker, 974 F.3d 594, 599 (5th Cir. 2020) (citing Austin v. Kroger Tex., L.P., 864 F.3d 326, 328 (5th Cir. 2017)).

Additionally, in cases involving contract interpretation, summary judgment is appropriate if the contract in question in unambiguous and can be given a certain or definite legal meaning or interpretation. D.E.W., Inc. v. Local 93, Laborers' Int'l Union, 957 F.2d 196, 199 (5th Cir. 1992). However, where a contract permits two or more reasonable constructions, the contract is deemed ambiguous, and summary judgment is inappropriate because the proper interpretation becomes a question of fact. Id. at 199.

## III. LAW & ANALYSIS

### A. Louisiana law governs the transactions at issue in this case.

Earlier in this litigation, the magistrate judge issued a report and recommendation on then-Defendants' motion to dismiss or, alternatively, transfer the case. (Doc. 42). That report and recommendation thoroughly articulated the basis for this court's exercise of specific personal jurisdiction over Rockwall and established the Western District of Louisiana as the proper venue to try Plaintiff's claims. (Doc. 42). We adopted that report and recommendation in whole and issued a judgment reflecting the same, (Doc. 56), after a *de novo* review of the findings to which Defendant objected, (Doc. 44). We find no need to depart from the earlier ruling based on Defendant's reassertions that the instant litigation is jurisdictionally improper. (Doc. 77). To that end, we decline to address these arguments again in our analysis, *infra*. Instead, we focus our efforts on the limited issues presented: (1) the extent to which a binding agreement existed; (2) the material terms of any existing agreement, including a quantifiable contract term; and (3) whether Defendant breached that agreement by ceasing its performance before the expiration of the contract's term. Neither of these questions warrants exhumation of the jurisdictional question. Accordingly, we now proceed to the merits of the partial summary judgment motion.

### B. An oral contract existed between CAM and Rockwall.

Plaintiff assumes the presence of a contract and lunges into its arguments to prove the elements of a breach-of-contract claim under Louisiana law. (Doc. 75-1). However, because Defendants dispute even the existence of a contract, much less a contractual obligation to remit monthly service fees on fixed-term basis, we will proceed measuredly and first determine whether a binding agreement existed between the parties.

Under Louisiana law, a valid contract requires capacity, consent, a lawful cause, and a valid object. See Granger v. Christus Health Cent. La., 12-1892 (La. 6/28/13), 144 So. 3d 736, 760-61; see also La. C.C. arts. 1918, 1927, 1966, 1971. Consent is "established through offer and acceptance," which may "be made orally, in writing, or by action or inaction that under the circumstances is clearly indicative of consent." La. C.C. art. 1927. Defendants are not charged with proving the nonexistence of an agreement; this burden lies with the party seeking enforcement of the contract. FIA Card Servs., N.A. v. Weaver, 10-1372 (La. 3/15/11), 62 So. 3d 709, 719 (citing La. C.C. art. 1831). Accordingly, as the party claiming rights under the contract, CAM bears the burden of proving a contract existed by a preponderance of the evidence. Fleet Intermodal Servs., LLC v. St. Bernard Port, Harbor & Terminal Dist., 10-1485, pp. 4-5 (La. App. 4 Cir. 2/23/11), 60 So. 3d 85, 88; see also SAÚL LITVINOFF & RONALD J. SCALISE, JR., LAW OF OBLIGATIONS § 12.1, in 5 LOUISIANA CIVIL LAW TREATISE (2d ed. 2021) ("A person who seeks the aid of a court in order to obtain the enforcement of an obligation must convince the court of the existence of his right, a conviction, or persuasion, to be accomplished through certain means of proof."). Article 1846 of the Louisiana Civil Code also provides that contracts exceeding $500 which are "not reduced to writing" must be proven by, at least, one credible witness and other corroborating evidence.

The parties in this matter never effected a written contract for the warehousing and logistics services at issue. Rockwall even goes as far to suggest that no binding contract existed between the parties, being careful to describe whatever transpired between it and CAM as an "[at-will] relationship" or "arrangement" (Doc. 77). While the evidence in the record suggests that the parties intended to be bound formally by written and signed agreements, that did not happen, and both parties acknowledge this failing. (Docs. 75-1, 77). Naturally, signatures affixed to the April 24,

2018 Draft, (Doc. 75-14), would have provided the indicia needed to conclude the parties mutually consented to be bound to all of its provisions. See Big "A" Sand & Gravel Co., Inc. v. Bay Sand & Gravel Co., Inc., 282 So. 2d 837, 841-43 (La. App. 1st Cir. 1973) (finding that a contract for sale was never effected where it was intended that any agreements reached would be incorporated in a written contract signed by all parties, but the signatures of purchasers were never affixed to the instrument evidencing the proposed sales contract); writ denied 284 So. 2d 773 (La. 1973). But in the absence of those signatures, what remains, potentially, is an oral agreement between the parties. La. C.C. art. 1846.

Louisiana law demands both credible witness testimony *and* general corroborating evidence to prove the existence of an oral contract. Archaga v. Johnson, 19-85, pp. 11-12 (La. App. 5 Cir. 10/16/19), 280 So. 3d 331, 340; writ denied 19-1837 (La. 1/14/20), 291 So. 3d 682. We take the affidavit of Patrick Shea, (Doc. 75-3), as credible witness testimony, despite CAM's role as a party in the instant litigation. See Meredith v. La. Fed'n of Teachers, 209 F.3d 398, 403 (5th Cir. 2000). In it, Mr. Shea acknowledges CAM's having provided the warehousing and logistics services discussed with Rockwall between October 2017 and January 2018. (Doc. 75-3). The oral contract is further corroborated by representations made by former Defendant Pratt and current Defendant Rockwall. See In re TK Boat Rentals, Inc., 411 F. Supp. 3d 351, 376 (E.D. La. 2019) (noting that if the plaintiff serves as the credible witness to prove the existence of an oral contract, a different party must supply the corroborating circumstances) (citing Suire v. Lafayette City-Par. Consol. Gov't, 04-1459, p. 29 (La. 4/12/05), 907 So. 2d 37, 58). Messrs. Turner and Batts' sworn declarations acknowledge an obligation to make monthly service fee payments to CAM: "Rockwall's only purported obligation to CAM was to make payment." (Docs. 77-1, 77-2). While Rockwall wishes to avoid the obvious, we can reasonably conclude that Rockwall made the

payment for warehousing and logistics services—not as some sort of corporate charity. Defendant made those payments for 28 months. (Doc. 75-1). CAM's invoices to Rockwall also indicate that the payments were made for "ALEXANDRIA WAREHOUSE MONTHLY CHARGES" (among related variations), providing further evidentiary support of an obligation related to warehousing and logistics services. (Doc. 75-13). Therefore, Rockwall orally obligated itself to pay monthly service fees to CAM for warehouse and distribution services based on both parties' sworn statements and Rockwall's performance of the obligation.

C. **Rockwall undertook an obligation to pay monthly service fees to CAM for warehouse and distribution services, but the term of the obligation is a genuine issue of material fact, and that dispute bars determination of a breach as a matter of law.**

To prove its breach-of-contract claim, CAM must prove (1) Rockwall undertook an obligation to perform; (2) Rockwall failed to perform that obligation, resulting in a breach; and (3) Rockwall's failure to perform its obligation resulted in damages to CAM. See Bruneau v. Crescent City Cleaning Servs. Corp., No. 16-CA-17, pp. 16-17 (La. App. 5 Cir. 12/14/16), 209 So. 3d 286, 290; see also IberiaBank v. Broussard, 907 F.3d 826, 835 (5th Cir. 2018). With a specific lawful obligation between CAM and Rockwall established, which nearly clears the hurdle established by the first element of Louisiana's breach-of-contract analysis, the question now becomes whether that contractual relationship persisted for a fixed or an unspecified duration. If the latter, this means that the relationship CAM and Rockwall was "at will" and could be terminated at any time.[2] La.

---

[2] Defendant erroneously relies on Louisiana's employment contract law to argue that the relationship between CAM and Rockwall was understood to be "at will." (Doc. 77). However, neither party has argued that an employer-employee relationship existed between the parties. Therefore, this analysis is misguided. The most plausible analogy would be a sublessor-sublessee relationship between CAM and Rockwall, respectively, but the warehouse lease CAM entered with EEIDD, (Doc. 75-9), forecloses this possibility. Relevant here, section 6 of the EEIDD lease, "Assignment or Subletting" provides:

C.C. art. 2024. In other words, of the four elements needed to confect a contract under Louisiana law, only one appears to be truly in dispute—consent. Specifically, there remains a genuine dispute of material fact surrounding the *length* of the contract to which the parties consented, as well as other possible appurtenant provisions such as increased rental prices after a time and increased square footage at the warehouse.

Plaintiff argues that both parties agreed on the fixed term of three years and produced emails reflecting such a term, as well as its leasing contract with EEIDD which contained a three-year term. (Doc. 75-1). Rockwall argues that because of the parties' failure to sign a finalized written instrument, the relationship is by default "at will" and terminable at any time. (Doc. 77). The evidence only *suggests* that both parties intended to be bound by a written contract. (Docs. 75-1, 75-7, 75-14, 77). Unfortunately, this formality fell by the wayside and led CAM to lease warehousing and distribution services in central Louisiana without *first* securing Rockwall's signature on a final draft of their agreement. (Doc. 75-9). Rockwall began remitting monthly

---

> Lessee [CAM] shall not transfer or assign this Lease or any interest therein or *sublet* the Leased Premises [at the Alexandria warehouse] or any part thereof, or grant any interest, privilege, or license whatsoever in connection with this Lease (collectively such transfer, assignment, Lease or grant of interest, privilege or license is referred to herein as an "Assignment"); provided, however, Lessee may execute an Assignment of its interest in the Lease to a Permitted Assignee without the consent of, but with prior notice to, Lessor [EEIDD], and provided further, that no Assignment to a Permitted Assignee shall relieve Lessee of any of its obligations hereunder. For purposes of this Section 6, "Permitted Assignee" shall mean any legally entity *owned* or *controlled* or *under common control with Lessee [CAM] or some or all of its stockholders.*

(Doc. 75-9) (emphasis added). Because Rockwall is not owned, controlled by, or under the common control of CAM or some or all of CAM's stockholder, such an arrangement would be impermissible under this contract. Thus, even a sublessor-sublessee or assigner-assignee argument would be untenable for our consideration.

service payments to CAM beginning in early 2018[3] for the leased space used to distribute Rockwall's products, which coincides with the start of the fixed term originally provided for in emails between Messrs. Shea, Turner, and Batts. (Docs. 75-4). The term provided in the December 11, 2017 and April 28, 2018 Drafts also identifies January 1, 2018 as the commencement date for Rockwall's monthly service fee payments. (Docs. 75-7, 75-14). But a plain reading of Louisiana Civil Code Article 2024 permits the termination of a contract that does not specify a duration. The record, at present, does not evince Rockwall's full-throated or even implied acceptance of the three-year term for its dealings with CAM. Without more, we cannot definitively find that the duration of the oral contract between CAM and Rockwall lasted for three years.

Conversely, Rockwall submitted payments for 28 of the 36 months of the alleged contractual term, or 78% of the anticipated length of the contract for warehousing and logistics services. (Docs. 75-1, 75-13). Such a substantial number of payments could be viewed as ratification of and acceptance of the proposed three-year term.[4] See, e.g., McFillen Rent-A-Car, Inc. v. Brierty, 625 So. 2d 364, 366 (La. App. 3d Cir. 1993) (where the court found that the

---

[3] Rockwall paid the invoice dated January 11, 2018 (prorated less 10 days for a payment due of $47,845.36) and February 2, 2018 (billed for full contracted amount of $49,928.69) on February 27, 2018. (Doc. 75-11). For all intents and purposes, Rockwall's performance can be said to have begun retroactive to January 11, 2018.

[4] Plaintiff's reply to Defendant's opposition of this motion also emphasizes that the *whole* of the written contract is not in dispute; the term—whether fixed or not—is the earnest point of contention. We agree with this characterization with one caveat. Neither the December 11, 2017 Draft, (Doc. 75-7), nor the April 24, 2018 Draft, (Doc. 75-14), governs the contract between CAM and Rockwall. While some elements from either draft may have been incorporated into the oral contract that emerged between CAM and Rockwall, certain clauses and provisions did not survive that transfiguration. Additionally, Defendant's point about Plaintiff request to enforce the April 24, 2018 Draft of the contract so that this court recognizes the three-year term *without* considering other provisions, like the choice of law and forum selection clauses (albethey decided matters), smells of the kind of provision cherry-picking Defendant argues in its opposition—a practice wholly disfavored by this court. See Burnett v. ARCCA, Inc., No. 15-1214, 2016 WL 1271073, at *4 (W.D. La. Mar. 31, 2016) (enforcing a mandatory forum selection clause in an *executed* letter agreement between the parties).

plaintiff's acceptance of twelve $500 payments was a ratification and acceptance of the proposed agreement to terminate the lease of a car). Given these two reasonable interpretations with respect to the duration of CAM and Rockwall's agreement, there exists a genuine dispute of material fact.

Since the length of the contract, *i.e.*, whether fixed or unspecified, necessarily determines whether we can find a breach in CAM and Rockwall's agreement, we construe the term as a material provision of the contract and **DENY** partial summary judgment on the first element of Plaintiff's breach-of-contract claim. Said differently, we find it premature to rule, as a matter of law, that Rockwall was obligated to remit monthly service payments for warehousing services on a fixed, three-year term without additional evidence and/or testimony at trial.

Without a determination on the nature of the term within CAM and Rockwall's oral contract, we do not reach the second element of Plaintiff's claim—whether Rockwall breached its agreement with CAM. See Bruneau, 209 So. 3d at 290; see also IberiaBank, 907 F.3d at 835. Rockwall does not dispute that it did not pay the monthly service fee from May 2020 through December 2020. (Doc. 77). However, that fact does not suggest liability since ambiguity as to the nature of the contract remains at issue. Therefore, because the determination of a breach on Rockwall's behalf is contingent upon the nature of the contract's term, we cannot rule as a matter of law on the second element in Plaintiff's breach-of-contract claim.

## IV. CONCLUSION

The adage, "Communication is key," repeatedly proves its worth and staying power in American culture, because of its simplicity and broad applicability to situations grand and small. Nowhere else (outside of perhaps marriage) does this phrase more aptly apply than in contractual disputes between parties. This case is no different. Faced with near-opposite narratives as to the nature of the obligation between CAM and Rockwall and an unsigned draft of a contract, this court

cannot channel Dr. Frankenstein's scientific prowess and fashion its own contractual creature to reflect the actual arrangement between the parties. The contract length between CAM and Rockwall is dispositive in this case. However, the record is not sufficiently developed for us to find that that term was fixed at three years or if it was unspecified and allowed Rockwall to render payments on more of a month-to-month basis. Plainly, further evidence is needed before deciding on the merits of Plaintiff's breach-of-contract claim.

Accordingly, this court hereby **DENIES** Plaintiff's motion for partial summary judgment as premature.

THUS DONE AND SIGNED at Alexandria, Louisiana this 25th day of October 2022.

DEE D. DRELL, SENIOR JUDGE
UNITED STATES DISTRICT COURT